# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 4, 2013      Decided December 27, 2013

Nos. 07-3131 & 11-3001

UNITED STATES OF AMERICA,
APPELLEE

v.

GERALD W. EILAND,
FREDERICK MILLER,
APPELLANTS

Appeals from the United States District Court
for the District of Columbia
(No. 04cr00379-01)
(No. 04cr00379-02)

*Eric H. Kirchman* argued the cause for appellant Gerald W. Eiland. With him on the briefs was *Kenneth M. Robinson*.

*Dennis M. Hart* argued the cause and filed the briefs for appellant Frederick Miller.

*Frederick A. Miller*, pro se, filed the briefs for appellant Frederick Miller.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen, Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *Suzanne*

*Grealy Curt*, and *John K. Han*, Assistant U.S. Attorneys. *Mary B. McCord*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, and ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  Appellants, Gerald Eiland and Frederick Miller, were convicted of various narcotics-related offenses.  The government's evidence at trial showed that Eiland and Miller organized an extensive drug ring in the Washington, D.C. area that had ties across the country.  After almost a year and a half of investigation including numerous wiretaps, the government indicted twenty-one defendants.  Many of the defendants pled guilty.  The government brought the remaining defendants to trial in two groups.  This appeal results from the second of these trials.  We also heard an appeal from the first trial, *United States v. Miller*, Nos. 07-3135 & 07-3139, and we have disposed of those issues in another opinion released today.

Eiland and Miller allege numerous errors affecting the second trial.  Although we reject most of appellants' arguments, we vacate Miller's insufficiently supported conviction for his participation in a continuing criminal enterprise and remand for resentencing.  We also vacate the fine imposed on Eiland by the district court and remand for reconsideration of that portion of Eiland's sentence.

## I. Facts and Procedural History

Our opinion in the companion case sets out the factual and procedural background of this case in some detail.  We

need not retell that story here, and we limit our discussion to facts relevant to the second trial and this appeal.

Sometime in 2003, the Safe Streets Task Force of the FBI began investigating a drug trafficking ring in Southeast Washington, D.C. The evidence revealed a wide-ranging drug operation headed by Eiland and Miller. The operation dealt in heroin, cocaine, cocaine base, and phencyclidine (PCP) and had ties around the country and to foreign travelers. On February 13, 2004, the task force applied for and was granted court authorization to wiretap Miller's cell phone. The court approved two extensions and the wiretap lasted three months. In April, the district court permitted the task force to tap Eiland's three phones and approved an extension for one of those phones. FBI Agent Daniel Sparks provided supporting affidavits for each of the initial wiretap and extension applications. Although the conspirators often used untapped payphones to discuss their illicit activities and spoke in guarded language while on the wiretapped phones, the FBI obtained substantial evidence from the wiretaps. Following a "reverse sting" operation, the FBI arrested Eiland and Miller in August 2004. The government charged twenty-one defendants in a 100-count superseding indictment. The defendants were charged with conspiring to distribute heroin, cocaine, cocaine base, and PCP between 1999 and 2004 in Virginia, the District of Columbia, and Maryland.

The defendants who did not plead guilty were separated into two groups for trial. Prior to the first trial, many of the defendants, including Eiland and Miller, moved to suppress the wiretap evidence because, they argued, the authorization violated the wiretap statute, 18 U.S.C. § 2510 *et seq.* The district court denied defendants' motions. *United States v. Eiland*, 398 F. Supp. 2d 160 (D.D.C. 2005). The government

relied heavily on the more than 14,000 recorded telephone conversations at both trials.

The first trial group, consisting of Frederick Miller, Timothy Thomas, and Corey Moore, went to trial in March 2006. The trial lasted two months, and the jury deliberations lasted a month. Thomas was convicted of most charges, including conspiring to commit a narcotics offense (cocaine) and RICO conspiracy. Moore was acquitted of all charges. Miller was found guilty of twenty-one counts of using a communication device to facilitate a drug-trafficking offense. The jury acquitted Miller of a count of PCP distribution and several counts of communication offenses. The jury was hung on the remaining counts against Miller, and the judge declared a mistrial on those.

Following the mistrial, the government moved to join Miller to the second group of defendants, scheduled to go to trial in October 2006. Miller opposed the motion because his court-appointed counsel from the first trial, Brian McDaniel, was unavailable. Rather than delay the trial of the entire second group or hold a separate trial for Miller, the court appointed Thomas Saunders to represent Miller.

On October 3, 2006, the second group of defendants— Robert Bryant, Alvin Gaskins, Gerald Eiland, and Frederick Miller—proceeded to trial. On November 15, 2006, the jury acquitted Bryant, the alleged PCP supplier for the conspiracy, of all charges. The jury found Gaskins guilty of narcotics conspiracy with regard to heroin only and acquitted Gaskins of all other charges. This court later reversed Gaskins's conviction as resting upon insufficient evidence. *United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012). The jury found Eiland guilty of narcotics conspiracy (Count 1) with the object of distributing heroin, cocaine, and cocaine base, but

not PCP; RICO conspiracy (Count 2); continuing criminal enterprise (CCE) (Count 3); attempt to possess with intent to distribute heroin (Count 4); and three counts of unlawful use of a communication facility. The jury found Eiland not guilty of six other communications counts and an accessory to murder charge. Miller was convicted of narcotics conspiracy (Count 1) with regard to heroin, cocaine, and cocaine base, but not with regard to PCP; RICO conspiracy (Count 2); CCE (Count 3); attempt to possess with intent to distribute heroin (Count 5); and three counts of unlawful use of a communication facility. The jury found Miller not guilty of attempt to possess with intent to distribute PCP and five additional communications counts.

Thus, the jury found the government had proved Miller and Eiland conspired to traffic heroin, cocaine, and cocaine base and committed the racketeering acts and CCE predicate offenses involving those same narcotics. But the jury found the government had not proved the charged offenses and acts involving the trafficking of PCP.

At appellants' sentencing hearings, the district court dismissed the narcotics conspiracy charges against Miller and Eiland as lesser-included offenses of the CCE counts. The court sentenced each to concurrent sentences of life imprisonment for RICO conspiracy and CCE, and lesser terms of imprisonment on the other counts. The court imposed a $7,000 fine on Miller for Counts 2 and 3. Sentencing (Miller) Tr. at 7, Nov. 28, 2007.[1] It imposed a

---

[1] The written judgment form for Miller states that the fine is imposed on Counts 1 and 2. This appears to be a mistake because the district court vacated Count 1 (narcotics conspiracy). Furthermore, "the pronouncement of the sentence constitutes the judgment of the court" and "the written judgment form is a nullity

$7,000 fine on Eiland for Count 1. Sentencing (Eiland) Tr. at 11, Nov. 28, 2007. Eiland and Miller filed timely notices of appeal. This court decided to hear the appeal arising out of the second trial separately from the appeal of the first trial.[2]

## II.  Admissibility of Wiretap Evidence

Eiland and Miller cite several reasons the wiretap evidence should have been suppressed. We address these arguments in turn.

An application for an order authorizing a wiretap must contain certain information, including "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued." 18 U.S.C. § 2518(1). A district court may authorize a wiretap after assessing both probable cause and necessity and finding:

> (1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that particular communications concerning that offense will be obtained through an interception; (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried; and (4) probable cause exists to believe that the communication facility sought to be wiretapped is being used, or is about to be used, in connection with the commission of the offense.

*United States v. Carter*, 449 F.3d 1287, 1292 (D.C. Cir. 2006) (citing 18 U.S.C. § 2518(3)). An initial wiretap may be

---

to the extent it conflicts with the previously pronounced sentence." *United States v. Love*, 593 F.3d 1, 9 (D.C. Cir. 2010).

[2] Miller is also a party in the related appeal from the first trial.

approved for a maximum of thirty days and may be extended for additional thirty-day periods upon a finding of continued probable cause and necessity. 18 U.S.C. § 2518(3), (5).

The probable cause standard for the wiretap statute is the same as the standard for a search warrant. *See United States v. Fairchild*, 189 F.3d 769, 775 (8th Cir. 1999); *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999); *United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990); *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990). The determination requires the authorizing court "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The necessity requirement is satisfied if "traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope." *United States v. Becton*, 601 F.3d 588, 596 (D.C. Cir. 2010). The necessity requirement prevents law enforcement from resorting to wiretapping where traditional investigative techniques would suffice. *Carter*, 449 F.3d at 1293. "[A] court will give close scrutiny to a contested wiretap application and will reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Id.* But because the necessity requirement was not intended "to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted," the government need only show "that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *Id.*

In evaluating appellants' objections to the district court's denial of their motions to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Johnson*, 437 F.3d 69, 71 (D.C. Cir. 2006). A reviewing court gives deference to the authorizing court's determinations of probable cause and necessity. *United States v. Glover*, 681 F.3d 411, 419–20 (D.C. Cir. 2012); *Johnson*, 437 F.3d at 71. We review the court's necessity determination for abuse of discretion. *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989). We "do[] not typically give a second layer of deference to a district court's assessment" of the authorizing court's determinations. *Glover*, 681 F.3d at 420.

A.

Appellants first argue the initial application for a wiretap on Miller's phone was inadequate because Agent Sparks's supporting affidavit contained "boilerplate" language incompatible with the particularized facts required to establish probable cause. Appellants' argument is unavailing. Even if the affidavit does contain some general language, "[a]pplications are not to be read in a piecemeal fashion." *United States v. Williams*, 580 F.2d 578, 589 (D.C. Cir. 1978). Sparks's affidavit contains specific facts regarding the locations where drug transactions took place, *see, e.g.*, Sparks Aff. 15–16, Feb. 13, 2004, Appellants' App'x 272–73, and the quantities of drugs and money observed by confidential informants, *see, e.g.*, *id.* at 16–18, Appellants' App'x 273–75. The affidavit also contains particularized facts regarding the phone to be tapped. These facts are sufficient to establish probable cause despite the fact that the phone's subscription was not in Miller's name. *See, e.g.*, *id.* at 21–23, Appellants' App'x 278–80 (explaining that confidential informants had described phone calls with Miller regarding drug activity and

that toll record and pen register analyses confirmed those phone calls were made on the subject phone); *id.* at 5–6, Appellants' App'x 262–63 (stating that although the phone subscription was not in Miller's name, the investigation had shown the phone was regularly used by Miller). The initial wiretap application contained particularized facts sufficient to establish each of the three probable cause requirements under the wiretap statute. *See Williams*, 580 F.2d at 589 ("[S]ections of the affidavits are framed in conclusory terminology, but they cannot rationally be separated from the preceding detailed descriptions of the investigative events.").

B.

Appellants also argue agents lacked probable cause to support an extension of the Miller wiretap. Agent Sparks's affidavit states FBI agents had discovered Miller sometimes used payphones to discuss drug activity in order to avoid being picked up by any wiretaps. Sparks Aff. 19–20, Mar. 17, 2004, Appellants' App'x 338–39. According to appellants, this finding vitiates any determination that there was probable cause to believe continued wiretaps would lead to the discovery of relevant communications. But Sparks's affidavit also contained plenty of examples of relevant calls picked up during the initial wiretap period. *See id.* at 16–17, Appellants' App'x 335–36 (describing conversations in which Miller agreed to send a courier to California and discussions regarding how to escape fraud detection at airports); *id.* at 21, Appellants' App'x 340 (describing a call in which one participant accidently referred to heroin without using coded language). Although the wiretaps were *less* successful because the defendants used payphones to escape detection, Sparks's extension affidavits demonstrated that the wiretaps did have *some* value to the investigation. *See United States v. Giordano*, 416 U.S. 505, 532–33 (1974) (where a wiretap

extension application shows that the wiretap produced results during the initial period, there is probable cause to believe the wiretap will continue to pick up communications concerning the offenses being investigated).  The extension authorizations were supported by probable cause.

C.

Eiland and Miller next argue the initial wiretap application for Miller's phone did not satisfy the necessity requirement.  They note the government had numerous cooperating witnesses and informants who were able to provide the government with adequate high-level inside information, and they complain the wiretap applications also did not explain why physical surveillance, pen registers, or toll-record analyses were inadequate to achieve the government's investigatory goals.

Agent Sparks's initial Miller affidavit provides detailed information about aspects of the conspiracy learned from cooperating witnesses.  Sparks noted the FBI had attempted to obtain additional high-level informants but had not succeeded. *See* Sparks Aff. 28, Feb. 13, 2004, Appellants' App'x 285 (noting the government offered Cinquan Blakney an opportunity to cooperate but he declined).  The affidavit also states that no informants could safely provide other detailed information including: (a) the means by which the drugs were obtained; (b) the manner and timetable of shipments; (c) the locations where drugs and illegally obtained assets were hidden; or (d) the manner in which the defendants concealed their activities.  *Id.* at 53, Appellants' App'x 310.  The affidavit is sufficiently detailed with regard to both the information obtained, and the type of information not obtainable, from informants.

Appellants say Victoria Owens (CW5) was a high-level informant who could give the government any necessary information about the conspiracy. But the affidavit demonstrates that even Owens did not have access to the most closely held secrets. Owens was not one of the few trusted people to whom Miller gave his phone number. *Id.* at 22–23, Appellants' App'x 279–80; *see Carter*, 449 F.3d at 1294 (wiretap affidavit adequately demonstrated necessity where it stated reasons why use of undercover informants would be inadequate to reveal the full nature and scope of the drug conspiracy). Furthermore, Owens would have been a problematic witness at trial—she was a known drug-user who was cooperating with the government as part of a plea agreement. It was reasonable for the government to seek wiretap evidence that would corroborate Owens's information and convince a jury at trial. *See* Sparks Aff. 52, Feb. 13, 2004, Appellants' App'x 309 (stating that wiretaps were needed to establish proof beyond a reasonable doubt).

Sparks's affidavit also explained that the conspirators were adept at detecting physical surveillance and had moved away from the area previously captured by a pole camera. *Id.* at 49–51, Appellants' App'x 306–08. While the use of a pen register had provided some information to the FBI, it could not convey to the government the substance of Miller's calls. *Id.* at 58–59, Appellants' App'x 315–16.

In sum, the wiretap applications described the relevant evidence that had been gathered through the use of traditional investigative techniques. The government was not obligated to include in the applications every detail known to it concerning the conspiracy. *See United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010) ("At best, the appellants suggest investigative techniques that might have provided some of the evidence needed, but they give us no reason to

doubt the district court's conclusion that having engaged in an adequate range of investigative endeavors, the government properly sought wiretap permission and was not required to enumerate every technique or opportunity missed or overlooked."); *Becton*, 601 F.3d at 597 (holding that various omissions from the wiretap affidavits did not undermine the government's necessity showing because the omissions were not material and the government had "adequately demonstrated the failure of normal investigative techniques to reveal the full nature and scope of the conspiracy"). It adequately demonstrated that traditional investigative techniques had been employed and holes remained in the evidence that could only reasonably be filled by a wiretap. The authorizing court did not abuse its discretion in finding that a wiretap was necessary for the government's investigation.

## D.

Appellants contend information discovered after the district court denied their motions to suppress demonstrates the wiretap applications contained critical misstatements that made an accurate determination of probable cause and necessity impossible. Specifically, appellants discovered that the cooperating witness referred to in the wiretap applications as CW5 was Victoria Owens, who shared a house with Miller. Appellants say if they had known CW5's identity, they could have successfully argued before the district court that the government had failed to provide the authorizing court with salient information undermining CW5's credibility. The government purposely concealed Owens's identity, according to appellants, so as not to undermine the evidence establishing probable cause. Appellants also make a contradictory argument. Because Owens was a trusted confidant of the drug conspiracy's leaders and could obtain valuable inside

information, the government was not able to show that a wiretap was necessary. Both arguments fail.

Appellants did not raise these arguments before the district court in their motion to suppress, nor did they renew that motion after they learned of CW5's identity. Thus, the arguments were forfeited and our review is only for plain error. *See United States v. Olano*, 507 U.S. 725, 732–35 (1993). Owens's identity was not hidden from the authorizing judge. *See* Notice 1, Feb. 13, 2004, D.D.C. Misc. No. 04-64, Gov't Supplemental App'x 1. The authorizing court had the information necessary to evaluate Owens's credibility, including information concerning her drug use, her past untruthful testimony, and her cooperation agreement with the government. Appellants offer no reason for the court to conclude that further information about Owens would have altered the court's determination of her credibility or otherwise undermined its finding of probable cause. Additionally, there was enough evidence aside from that supplied by Owens to establish probable cause. With regard to the necessity determination, the government described information to which Owens did not have access and showed that a wiretap was necessary despite her cooperation. Thus, the omissions affected neither the determination of probable cause nor the determination of necessity. *See Becton*, 601 F.3d at 597.

Moreover, the defendants did not request disclosure of CW5's identity in support of their request for a *Franks* hearing.[3] Because appellants failed to seek that disclosure

---

[3] When the defendants filed their motions to suppress, they also requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), to inquire whether Agent Sparks had intentionally or recklessly included a material false statement in the wiretap affidavit. However, the statements defendants alleged were false

and did not argue before the district court that the government improperly masked CW5's identity, that argument is also forfeited on appeal. *See Flynn v. Comm'r*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001) ("Generally, an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent exceptional circumstances.").[4] Appellants have not demonstrated that either the masking of Owens to protect her from retaliation or the district court's failure to hold a *Franks* hearing on the basis of that masking affected their substantial rights. *See Olano*, 507 U.S. at 734.

E.

Appellants' final argument with regard to the wiretap evidence is that the authorizing court should not have authorized extensions where, appellants contend, the government did not describe the investigation's progress in its extension applications. An application for an extension must include "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." 18 U.S.C. § 2518(1)(f). The purpose of this provision is to "permit the court realistically to

---

were unrelated to CW5's identity or credibility. Appellants do not allege the district court erred by denying the motion for a *Franks* hearing based on the arguments actually presented to it.

[4] Appellants also argue that by not listing CW12, who Miller asserts is Rashawn Briggs, in the initial wiretap application affidavit, the government omitted the critical fact that a knowledgeable and trusted insider was cooperating, thus preventing the authorizing court from making a reliable finding of necessity. But the record shows that Briggs was in a halfway house from January 16, 2004 to March 5, 2004. Oct. 19, 2006 AM Trial Tr. at 11. Briggs was not mentioned in the initial February 13, 2004 affidavit because he was not able to provide assistance to the investigation until he left the halfway house. *See id.* at 106.

appraise the probability that relevant conversations will be overheard in the future." *Giordano*, 416 U.S. at 532. Each of the government's extension applications includes a lengthy "summary of pertinent calls." *See, e.g.*, Sparks Aff. 13–33, Mar. 17, 2004, Appellants' App'x 332–52. Sparks's affidavits detail the results of the wiretaps and the shortcomings of continued traditional investigative techniques. The extension applications demonstrated that the wiretaps were producing results and thus established continuing probable cause. *See Giordano*, 416 U.S. at 532–33. The authorizing court did not err in granting the government's applications for extensions.

### III. Overview Witness Testimony

The district court erred, appellants say, by permitting government witnesses to give improper overview testimony. The government's first witness at trial was FBI Agent John Bevington. Agent Bevington testified as an expert on investigations of illegal conspiracy cases. Oct. 4, 2006 AM Trial Tr. at 11–12. Specifically, Agent Bevington began his testimony with a definition of conspiracy[5] and explained conspiracies are conducted secretly, often using coded language. *Id.* at 14–17. Agent Bevington also testified about investigative techniques, like controlled drug buys, search warrants, surveillance, and interviews. *Id.* at 19–26. He described the procedure for obtaining a search warrant and authorization for a wiretap and explained how the FBI monitors a wiretap. *Id.* at 25–33. Appellants complain this background testimony was erroneously admitted because it was unrelated to matters beyond a lay jury's understanding and would not help the jury "to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.

---

[5] Agent Bevington testified that a conspiracy is "an agreement between two or more people to commit criminal acts." *Id.* at 14.

16

Agent Bevington's background testimony was properly admitted. "The operations of narcotics dealers repeatedly have been found to be a suitable topic for expert testimony because they are not within the common knowledge of the average juror." *United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992); *see also United States v. Perez*, 280 F.3d 318, 341–42 (3d Cir. 2002) (permitting expert testimony regarding drug traffickers' use of cell phones and pagers to frustrate police investigations); *United States v. Gil*, 58 F.3d 1414, 1421–22 (9th Cir. 1995) (permitting *modus operandi* testimony about drug traffickers' counter-surveillance techniques because "[s]uch evidence helps the jury understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior"); *United States v. Tapia-Ortiz*, 23 F.3d 738, 741 (2d Cir. 1994) ("[T]he Government was justified in introducing expert testimony explaining that drug traffickers employ certain techniques, such as using beepers, cash, and nicknames, in order to avoid detection."). Courts have also permitted law enforcement agents to testify as experts on investigative techniques. *Cf. United States v. Miller*, Nos. 07-3135 & 07-3139, slip op. at 11 (D.C. Cir. Dec. 27, 2013) (FBI Agent Sparks's lay testimony about investigative techniques would not have been error had Sparks testified as an expert).

Agent Bevington's testimony fits within the type of *modus operandi* expert testimony permitted by this and other courts, and his description of investigative techniques provided useful background information. The district court's admission of this testimony—which aided the jury in assessing the quality of the evidence—was not error.[6]

---

[6] Even if Agent Bevington's testimony had introduced error, appellants have not alleged any prejudice as a result.

Appellants also argue Agent Bevington improperly vouched for the cooperating witnesses. Agent Bevington explained information given by a cooperating witness was usually corroborated by the FBI: "[E]ven if we don't know it at that particular time, we have the ability to investigate anything they tell us and determine whether or not they are being truthful and accurate." Oct. 4, 2006 AM Trial Tr. at 34; *see also id.* at 37 ("Before the government will agree to the plea agreement . . . we're going to know the information they're providing is correct or we're going to go out and conduct further investigation to determine what they have been telling us is correct."). Agent Bevington described the various corroborative techniques. *Id.* at 37–38. However, testifying as an expert witness, he disclaimed any specific knowledge regarding the cooperating witnesses in this case; he spoke only about the process of obtaining cooperating witnesses generally. *Id.* at 44–45.

Defendants' motion in limine to limit the testimony of the government's expert witnesses did not address the errors claimed on appeal. *See* Eiland Mot. in Limine, July 15, 2006, D.D.C. 04-379, ECF No. 697. Defendants' motion asked the court to order the government to comply with Federal Rule of Criminal Procedure 16(a)(1)(G) by giving the defendants a written summary of the proposed witness testimony.[7] *Id.* Eiland also requested limitations on the breadth and scope of expert testimony, asking that the experts not be allowed to act as "super-narrators who guide the jury through the evidence in a manner that combines hearsay, frustrates cross-examination, and usurps the jury's function." *Id.* at 3. At no point did any of the defendants object to Agent Bevington's

---

[7] Defendants' objection at trial similarly only concerned the government's compliance with Rule 16(a)(1)(G). Oct. 4, 2006 AM Trial Tr. at 13–14.

testimony regarding the development or credibility of cooperating witnesses. Therefore, we review this portion of Agent Bevington's testimony for plain error. *See United States v. Brown*, 508 F.3d 1066, 1068 (D.C. Cir. 2007).

To establish plain error, appellants must show there was "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [their] substantial rights." *United States v. Wilson*, 605 F.3d 985, 1022 (D.C. Cir. 2010). Even when plain error is demonstrated, "we . . . reverse only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* Appellants "bear[] the burden of proving each element under this standard." *Id.*

Agent Bevington's cooperating witness testimony constitutes plain error in light of this court's holding in *United States v. Moore*, 651 F.3d 30, 59–61 (D.C. Cir. 2011), decided after appellants' trial.[8] In *Moore*, an FBI agent similarly testified that cooperating witnesses had inside information the FBI would try to verify before striking a deal with them. 651 F.3d at 59. This court found the "clear implication was that the government had selected only truthful co-conspirator witnesses for the pre-indictment investigation, from whom the jury would hear during the trial." *Id.* at 59–60. Such testimony infringes on the jury's role as the sole judge of a witness's credibility. *Id.* at 59. Agent Bevington's testimony was improper insofar as he vouched for the reliability of the investigation and the cooperating witnesses the government planned to have testify at trial. *See id.* at 60.

---

[8] The "plainness" of an error is evaluated as of the time of appellate review, not the time of the district court's decision. *Henderson v. United States*, 133 S. Ct. 1121, 1127–29 (2013).

Nevertheless, we think any error introduced is harmless. Bevington's testimony did not affect appellants' substantial rights or affect the fairness, integrity, or public reputation of the proceedings. Prior to Agent Bevington's testimony, the court instructed the jury it was "not bound by an expert's opinion," Oct. 4, 2006 AM Trial Tr. at 12, and the court in its preliminary and final instructions told the jury it was the sole judge of witness credibility, Oct. 3, 2006 AM Trial Tr. at 97–98; Nov. 7, 2006 AM Trial Tr. at 101. The court's final jury instructions included a warning to the jury that "[a] witness who realizes that he may be able to obtain his or her own freedom or receive a lighter sentence by giving testimony may have a motive to lie. The testimony of a witness who has entered into a plea agreement should be received with caution and scrutinized with care." Nov. 7, 2006 AM Trial Tr. at 106. The court's instructions thus minimized any harm caused by Bevington's vouching. *See Moore*, 651 F.3d at 62 (certain errors "had no prejudicial effect in view of limiting instructions").

Furthermore, the impact of Agent Bevington's testimony was mitigated by other factors. Unlike in *Moore*—where this court also found the error harmless—Agent Bevington acknowledged he had no knowledge of the particular cooperating witnesses who would testify in appellants' trial. On cross-examination, Eiland's attorney got Bevington to agree that sometimes cooperating witnesses lie and that ultimately law enforcement officers have to make a "subjective" judgment as to whether the witness is credible. Oct. 4, 2006 AM Trial Tr. at 52–53. Here, even without the cooperating witnesses, there was significant evidence of appellants' guilt, including corroborating wiretaps. *See Brown*, 508 F.3d at 1074 (prosecutor's error in vouching for a government witness did not require reversal because the other evidence weighed heavily against defendant and because the

judge had instructed the jury that it was the sole judge of witness credibility); *see also United States v. Rawlings*, 522 F.3d 403, 410–13 (D.C. Cir. 2008). Appellants have not met their burden of demonstrating that the error affected their substantial rights.[9]

## IV. Lay Opinion Testimony Interpreting Wiretap Evidence

We have held that a lay witness may not give opinion testimony interpreting cryptic evidence when the testimony violates Federal Rule of Evidence 701. *See United States v. Hampton*, 718 F.3d 978, 981–83 (D.C. Cir. 2013); *see id.* at 985–86 (Brown, J., concurring). Appellants contend the district court violated this rule in allowing FBI Agent Hall, a government witness, to give lay opinion testimony interpreting the calls intercepted by the government's wiretaps. Agent Hall, who participated in the investigation of appellants' drug operation, testified numerous times throughout the trial. At times, Agent Hall's testimony was intended to put in context the recorded calls played at trial. However, even if Agent Hall's testimony constituted plain

---

[9] To the extent appellants object to Agent Bevington's testimony regarding the mechanics of a plea deal, there was no plain error. Agent Bevington merely stated that after a cooperating witness's compliance is complete, the government files a motion giving the court discretion to depart from a mandatory minimum in sentencing the witness. Oct. 4, 2006 AM Trial Tr. at 39. "This court has held that plea agreements can be introduced by the prosecution and referred to in their entirety, because so doing does not improperly bolster the witness who signed the plea agreement." *Brown*, 508 F.3d at 1074. The court has only suggested that "use of the 'truthfulness' portions of plea agreements becomes impermissible vouching when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." *Id.* Moreover, any error would not be reversible for the reasons discussed above.

error under *Hampton*, appellants have not demonstrated error warranting reversal. Appellants' briefs fail to specifically describe the allegedly erroneous testimony or how it may have affected the convictions. Appellants have failed to demonstrate any error was substantially prejudicial.

## V. Replacement of Miller's Appointed Counsel Prior to the Second Trial

Miller argues he was denied his Sixth Amendment right to counsel when the district court, over his objection, replaced his appointed counsel from the first trial with new counsel prior to the second trial.[10] Miller says the Sixth Amendment

---

[10] In addition, Miller claims he was denied his constitutional right to be present at all stages of his trial because the district court decided to replace Miller's counsel outside Miller's presence. We need not decide now whether a defendant has a right to be present at a hearing on replacing counsel. *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[The] privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow, [but] due process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence."). Miller was present at the June 26, 2006 hearing at which the court heard the government's motion to join Miller to the trial of the second group of conspirators. Hr'g Tr. at 3, June 26, 2006. At that hearing the court also considered Miller's opposition to that motion and Miller's request for a severance or postponement. *Id.* at 4–5. Miller had an opportunity to tell the court, through counsel, he wished to have McDaniel continue to represent him. *Id.* Although Miller filed a written motion for severance later, on July 2, the court heard and considered argument at the June 26 hearing. Miller did not attend the brief status conference on July 18 at which the court ordered Miller joined to the second trial and appointed Saunders to represent him. But the court did not hear argument on July 18. Thus, Miller was present at the only hearing where his presence

compels a different rule: once an indigent defendant and his appointed counsel develop an attorney–client relationship, the defendant has a constitutional right to continued representation by that attorney.

Even assuming *arguendo* Miller had a Sixth Amendment right to continued representation, such a right is not absolute where a continuance is sought to retain or replace counsel of choice. *United States v. Burton*, 584 F.2d 485, 489 (D.C. Cir. 1978). Rather, the defendant's right "must be carefully balanced against the public's interest in the orderly administration of justice." *Id.* The district court considers such a motion for a continuance in its sound discretion and "is not subject to review absent a clear abuse." *Id.* at 489–90. "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Among the factors to be weighed by the trial judge in considering a motion for a continuance are

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has

---

might have been useful—the June 26 hearing. Miller fails to offer any reason to suggest his attendance at the July 18 conference would have served any purpose, particularly as he had previously fully conveyed his views to the district court.

other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; [and] the complexity of the case.

*Burton*, 584 F.2d at 490–91. "In weighing these factors, we presume that the trial judge's decision was reasonable, and find a violation of the right to the effective assistance of counsel only if the denial of a continuance was unreasoning and arbitrary." *United States v. Poston*, 902 F.2d 90, 97 (D.C. Cir. 1990).

Applying the relevant *Burton* factors to this case, we conclude that, even if Miller had a Sixth Amendment right to continued representation by his appointed counsel, the district court did not abuse its discretion in denying Miller's motion for a continuance and replacing Miller's counsel. Because of McDaniel's busy trial calendar, Miller was requesting a seven-month continuance. The district court reasonably concluded this was too long for Miller's co-defendants, who were being held without bail, to wait for their joint trial. *See* Hr'g Tr. at 12, June 26, 2006. On the other hand, severing Miller's trial would have imposed an enormous inconvenience on the government, witnesses, and the court, which would have had to repeat a three-month trial for the *third* time.[11] Thomas Saunders had a clear calendar to

---

[11] Miller moved for a continuance for the second trial group or, in the alternative, a severance so Miller could be tried separately at a later time when McDaniel was available to continue his representation. Miller's motion for a severance here is nothing more than a motion for an individual continuance. Thus, we review

prepare for Miller's trial with the second group of defendants in October 2006, *see* Hr'g Tr. at 2, July 18, 2006, and the judge required McDaniel to continue his representation through the beginning of voir dire to help Saunders prepare for trial. *See id.* at 2–3; Order, July 18, 2006, D.D.C. 04-379, ECF No. 701. The judge offered to assist Saunders by holding prompt status conferences any time that would aid Saunders's preparation. Hr'g Tr. at 3, July 18, 2006. In these circumstances, it was reasonable for the trial court to conclude that two months would provide Saunders with enough time to prepare for trial, particularly because he had the advantage of being able to review the proceedings of the first trial in which Miller was tried on the same charges.

Miller also has not shown any harm from the district court's decision. "In order to obtain reversal, an appellant must show that actual prejudice resulted from denial of the continuance." *United States v. Celis*, 608 F.3d 818, 839 (D.C. Cir. 2010). There is no indication Saunders was not fully prepared by the time trial started. To the contrary, when just prior to trial the government moved for a continuance to accommodate an ill witness, Saunders opposed that motion. Resp. to Gov't Mot. to Continue, September 5, 2006, D.D.C. No. 04-379, ECF No. 766. Miller is unable to point to any way in which he was denied effective assistance of counsel.[12]

The district court did not err in deciding to retry Miller with the second group of defendants, to hold the second trial

---

the district court's denial of the alternate motions under the same standard.

[12] At oral argument Miller's counsel stated that the short time Saunders had to prepare created an "appearance of unfairness." But without actual prejudice, a district court's denial of a continuance is not reversible error. *See Celis*, 608 F.3d at 839.

as originally scheduled in October 2006, and to replace Miller's appointed counsel to adhere to that trial date.

## VI. Sufficiency of the Evidence Against Miller

Miller contends there was insufficient evidence presented at trial to sustain three of his convictions. The court reviews challenges to the sufficiency of the evidence "de novo, viewing the evidence in the light most favorable to the government, and affirming a guilty verdict where any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Littlejohn*, 489 F.3d 1335, 1338 (D.C. Cir. 2007). The court "give[s] full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Id.*

## A. Continuing Criminal Enterprise

Miller argues, through counsel, there was insufficient evidence for the jury to convict him of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. To convict a defendant of CCE, the government must prove the defendant committed: "1) a felony violation of the federal narcotics law; 2) as part of a continuing series of violations; 3) in concert with five or more persons; 4) for whom the defendant is an organizer or supervisor; 5) from which he derives substantial income or resources." *Moore*, 651 F.3d at 80. Miller contends the government failed to prove he "occupie[d] a position of organizer, a supervisory position, or any other position of management" with regard to five or more people. 21 U.S.C. § 848(c)(2)(A). To satisfy this element, the government must show the defendant "specifie[d the supervisees'] activities in adequate detail." *United States v. Williams-Davis*, 90 F.3d 490, 508 (D.C. Cir. 1996). The defendant must have "exercise[d] some sort of managerial

responsibility." *Id.* "Delegation of management to an intermediate supervisor does not prevent lower-level subordinates from being counted in the continuing criminal enterprise statute." *United States v. Delgado*, 4 F.3d 780, 785 (9th Cir. 1993). The government identifies five individuals whom it claims were Miller's supervisees: Timothy Thomas, Tyrone Thomas, Charles Brown, Darius Ames, and Jay Ingram.

There was sufficient evidence for a jury rationally to find Miller exercised a supervisory role over Tyrone Thomas and Timothy Thomas. Miller exercised a supervisory role over both of these individuals in arranging for Tyrone to transport money to Arizona and to transport cocaine back to Washington, D.C. "Drug runners can be considered managees for purposes of 21 U.S.C. § 848." *United States v. Wilson*, 605 F.3d 985, 1030 (D.C. Cir. 2010). In March 2004, Miller called Tyrone and arranged for him to drive to Washington. Oct. 10, 2006 PM Trial Tr. at 71–73. Miller then told Tyrone that Timothy Thomas would introduce Tyrone to Eiland, with whom Tyrone would be exchanging the money for drugs in Arizona. *Id.* at 73–74. As Tyrone was transporting the cocaine back to Washington, Miller kept in contact with Timothy Thomas, who was checking on Tyrone's progress. Oct. 12, 2006 AM Trial Tr. at 82–83; Calls 5589, 5659, Gov't Supplemental App'x 51–53. When Tyrone told Timothy Thomas the cocaine had been lost, Miller organized the response, at one point instructing Timothy to get the baggage claim number for Tyrone's bag. Oct. 11, 2006 AM Trial Tr. at 24–26; Call 6154, Gov't Supplemental App'x 55–56. This evidence establishes Miller exercised the requisite supervisory control over both Tyrone Thomas and Timothy Thomas, organizing the transportation of money and drugs.

The government also presented sufficient evidence to establish Miller was a manager of Charles Brown. When Tyrone claimed that the cocaine he shipped by bus was lost, Miller recruited Brown to help find the cocaine. Oct. 12, 2006 PM Trial Tr. at 13–14; Call 6133, Gov't Supplemental App'x 54. At another time Miller arranged for Brown to accept a package of heroin for Miller. Oct. 18, 2006 AM Trial Tr. at 31–32.

The government's evidence with regard to Darius Ames is weaker but still sufficient to support the jury's conclusion that Ames was a supervisee of Miller. Darius Ames bagged heroin for Eiland. Oct. 4, 2006 PM Trial Tr. at 26–27. On a few occasions Miller came into the stash apartment where Ames was bagging and took heroin. *Id.* at 43–44; Oct. 5, 2006 AM Trial Tr. at 8–14. Miller would measure out 25 grams of heroin, stretch it to 50 grams, bag it, and leave $1,000 with Ames, directing him to give the money to Eiland. Oct. 5, 2006 AM Trial Tr. at 8–14. In another instance, Eiland, who was out of town at the time, directed Ames to pick up a shoe box from Miller. *Id.* at 15–16. Miller was to call Ames when Miller was ready for Ames to pick it up. *Id.* When Miller called Ames, Ames drove to meet Miller and, following Miller's instruction, went through the alleyway to the back door and into the basement of Miller's aunt's house. *Id.* at 16; Oct. 4, 2006 PM Trial Tr. at 57. Miller proceeded to give Ames a shoebox of money that Ames took and stored for Eiland. Oct. 4, 2006 PM Trial Tr. at 57–58. Together, this evidence, although not strong, supports the inference that Ames was Miller's subordinate. Both Miller and Eiland viewed Ames as a lower-level conspirator—a gofer whom they were free to direct. Under the deferential standard we apply on reviewing a sufficiency challenge, we conclude a jury rationally could have found Ames to be a supervisee of Miller.

Nevertheless, the government failed to produce sufficient evidence to demonstrate that Jay Ingram was supervised by Miller. FBI Agent Hall testified that Ingram was a lieutenant in the organization and was Miller's cousin. Oct. 17, 2006 AM Trial Tr. at 56. But Ingram's familial relation to Miller is irrelevant, and Agent Hall's description of Ingram as a lieutenant is conclusory. The agent's opinion regarding Miller's role has no more weight than the facts upon which it is based, and those were insufficient. There was evidence that Ingram obtained PCP from Miller. Oct. 19, 2006 PM Trial Tr. at 52–53. But a buyer–seller relationship, without more, does not suggest a managerial relationship. *See United States v. Mitchell*, 49 F.3d 769, 772 (D.C. Cir. 1995); *see also United States v. Witek*, 61 F.3d 819, 822–23 (11th Cir. 1995) ("Buyers and sellers often need to accommodate one another when meeting and arranging for delivery. Such conduct is simply incidental to the buyer-seller relationship."). A dealer who simply sells drugs to other dealers and is paid from the proceeds of their sales, but who has no other involvement in their sales, does not exercise the managerial control required for a CCE conviction. *Id.* There was no evidence presented at trial that Miller played any ongoing role in Ingram's sales after supplying Ingram with PCP. Furthermore, the jury's verdict demonstrates that it did not deem the PCP evidence credible. The jury found Miller not guilty of all PCP-related charges.

The government points to an intercepted phone call in which Eiland, who was looking for drugs, called Miller and asked where Ingram was. Oct. 17, 2006 AM Trial Tr. at 56–57, 65; Call 1172, Gov't Supplemental App'x at 37. Miller responded that Ingram was with him. *Id.* Rashawn Briggs, a cooperating witness, also testified he once saw Eiland, Miller, and Ingram meeting outside a carry-out restaurant. Oct. 19, 2006 AM Trial Tr. at 34–36. None of this evidence suggests

Miller acted in a supervisory capacity with regard to Ingram.[13]  This evidence of association is not enough to prove that Miller managed Ingram.

The government's evidence at trial was insufficient to convince a rational jury beyond a reasonable doubt that Miller acted as an organizer, supervisor, or manager for five or more individuals.  Because the government failed to establish one of the elements of CCE, we vacate Miller's conviction on this count.

## B.  Narcotics Conspiracy

In a supplemental pro se brief, Miller challenges the sufficiency of the evidence for his conviction of narcotics conspiracy.  In particular, Miller argues the evidence introduced at trial varied from the indictment because it established multiple conspiracies rather than the single overarching drug conspiracy charged and that he was prejudiced by this variance.  Even though the narcotics conspiracy conviction was vacated by the district court as a lesser included offense of CCE, we address Miller's argument because the CCE conviction must be vacated and the narcotics conspiracy conviction can now be reinstated.

To establish the existence of a narcotics conspiracy in violation of 21 U.S.C. § 846, the government must show an agreement between at least two people to violate narcotics

---

[13] There was substantial evidence presented at trial showing that Ingram was a supervisee of Eiland.  *See* Oct. 4, 2006 PM Trial Tr. at 58–71 (Ames testifying that Eiland twice took Ames and Ingram to Phoenix to purchase heroin); Oct. 19, 2006 AM Trial Tr. at 15 (Briggs testifying that Ingram distributed cocaine base and heroin for Eiland).  There was not the same evidence with regard to Miller's relationship with Ingram.

law. *United States v. Baugham*, 449 F.3d 167, 171 (D.C. Cir. 2006). "In determining whether the evidence supports a finding of a single conspiracy or instead only demonstrates multiple conspiracies, we look at whether the defendants shared a common goal, any interdependence between the alleged participants, and any overlap among alleged participants, such as the presence of core participants linked to all the defendants." *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996). To warrant reversal, the defendant bears the burden of showing "(1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988). The court will uphold the verdict if the evidence adequately supports the jury's finding that a single conspiracy existed. *Id.*

Miller demonstrates neither variance nor prejudice. The goal of the conspiracy, as demonstrated at trial, was to distribute mass quantities of drugs for profit. The evidence demonstrated the substantial profit the defendants reaped from their participation in the conspiracy. Additionally, there was substantial interdependence among the defendants. The evidence at trial exposed a large section of the conspiracy's procurement and distribution chain. For instance, Miller and Eiland arranged for Tyrone Thomas to travel to Arizona to purchase wholesale amounts of cocaine. At one time Miller also arranged for Brown to accept a package of heroin on his behalf. Oct. 18, 2006 AM Trial Tr. at 31–32. The conspiracy employed Darius Ames and Eric Butcher to process and bag heroin for street-level distribution. Oct. 4, 2006 PM Trial Tr. at 29–31; Oct. 19, 2006 PM Trial Tr. at 48–50. Eiland and Miller also occasionally stretched heroin at the stash house.

Oct. 4, 2006 PM Trial Tr. at 43. Ricky Gore and Chester Craig Simon would then obtain the heroin from Ames or Eiland and distribute it to street-level sellers. *Id.* at 52–57; Oct. 19, 2006 PM Trial Tr. at 30–35. Gore also obtained crack from Eiland. Oct. 19, 2006 PM Trial Tr. at 44–46. The government's evidence clearly demonstrates the conspirators' interdependence in obtaining, processing, and distributing the narcotics. Each conspirator depended on the others to play their roles in the scheme. Finally, this evidence also establishes the overlap element—Miller and Eiland were key participants in all of the acts, arranging for the purchase and distribution of cocaine, heroin, and crack.

Even assuming there was a variance, Miller failed to show he was substantially prejudiced by it. "The risk of 'spillover prejudice,' which may occur when a jury imputes evidence from one conspiracy to a defendant involved in another conspiracy, is less likely the fewer the defendants." *United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997). Only four defendants were tried together in Miller's second trial. *See id.* (little risk of spillover prejudice where only four defendants were tried). There is also less risk of spillover prejudice where, as here, the government presents wiretap evidence so that the jury can examine each individual defendant's words separately in order to convict. *See id.* The jury's not-guilty verdicts for Bryant on all charges and the remaining defendants on the PCP-related charges suggest the jury was able to consider the evidence against each defendant and for each charge individually. *See United States v. Phillips*, 664 F.2d 971, 1017 (5th Cir. Unit B 1981) (where defendants were convicted on some counts and acquitted on others, "the jury's verdict reflects that it carefully considered the evidence supporting each charge against each defendant").

The government presented sufficient evidence to sustain Miller's narcotics conspiracy conviction. The district court vacated the conviction on this count as a lesser-included offense of the continuing criminal enterprise conviction. Because we vacate the CCE conviction, we will reinstate the narcotics conspiracy count. *See Rutledge v. United States*, 517 U.S. 292, 306 (1996) (courts of appeal "may direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense"); *United States v. Baylor*, 97 F.3d 542, 548 (D.C. Cir. 1996).

## C. RICO Conspiracy

In his pro se brief, Miller also challenges the sufficiency of the evidence supporting his RICO conspiracy conviction. The RICO statute, 18 U.S.C. § 1962(d), makes it unlawful to conspire to violate § 1962(c), which, in turn, provides that it is unlawful for anyone "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Miller contends the government failed to prove at trial the existence of either an "enterprise" or "a pattern of racketeering activity."

The RICO statute defines "enterprise" to include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise must have three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). An association-in-fact enterprise "need not have

a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times." *Id.* at 948. "[P]roof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.* at 951.

A pattern of racketeering activity requires "two or more related predicate acts of racketeering within a 10–year period." *United States v. Crosby*, 20 F.3d 480, 481 (D.C. Cir. 1994). The government must show that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

The same evidence that supports the narcotics conspiracy conviction supports the jury's finding of an enterprise. The enterprise's purpose was to distribute drugs for profit. The defendants organized themselves so each would carry out a separate role in the distribution chain, with Eiland and Miller overseeing the operation. Rashawn Briggs testified he was dealing drugs with Eiland and Miller between 2000 and 2002. Oct. 19, 2006 AM Trial Tr. at 56. Thus, the enterprise continued for a period "sufficient to permit the[] associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

The government also presented evidence establishing the existence of an agreement to engage in a pattern of racketeering activity. *See Salinas v. United States*, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . ."). The jury

found the government proved agreement to commit three racketeering acts—Act 1 (conspiracy to distribute heroin, cocaine, and cocaine base), Act 4 (attempt to possess with intent to distribute cocaine and unlawful use of a communication facility), and Act 6 (attempt to possess with intent to distribute heroin). Miller argues the proven acts were not related. In fact, the predicate acts were related by the nature of the acts (all narcotics offenses), temporal proximity (the acts all occurred between 1999 and 2004), purpose (to distribute drugs for profit), and participants. The government established the existence of both an enterprise and an agreement to engage in a pattern of racketeering activity. Miller's challenge to the RICO conspiracy conviction will be denied.

## VII. Fine Imposed on Eiland

Before sentencing Eiland, the district court vacated Count 1, the narcotics conspiracy conviction, as a lesser included offense of Count 3, the continuing criminal enterprise conviction. Sentencing (Eiland) Tr. at 4, Nov. 28, 2007; Judgment as to Eiland 1, Feb. 7, 2008, D.D.C. 04-379, ECF No. 1029. Nevertheless, the court ordered Eiland to pay a fine of $7,000 on Count 1. Sentencing (Eiland) Tr. at 11, Nov. 28, 2007; Judgment as to Eiland 7, Feb. 7, 2008, D.D.C. 04-379, ECF No. 1029. The government concedes it was error for the court to impose that fine. We vacate the fine and remand to the district court to consider whether it intended to impose the fine on one of the remaining counts of conviction.

* * * * *

We affirm Gerald Eiland's convictions but vacate his fine on Count 1. We remand for consideration of whether a fine should be imposed on one of the remaining counts of conviction. We vacate Frederick Miller's conviction on

Count 3, continuing criminal enterprise, but affirm and reinstate his conviction on Count 1, narcotics conspiracy. Accordingly, we vacate Miller's sentence and remand for resentencing.

*So ordered.*