# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 13, 2018        Decided June 15, 2018

No. 15-3060

UNITED STATES OF AMERICA,
APPELLEE

v.

CALVIN STODDARD,
APPELLANT

Consolidated with 15-3061, 15-3076

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cr-00200-6)
(No. 1:13-cr-00200-17)
(No. 1:13-cr-00200-2)

*Jason M. Wilcox*, appointed by the court, argued the cause for appellants. With him on the briefs were *William H. Burgess*, *William L. Welch III*, and *Edward C. Sussman*, all appointed by the court.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman*, *John P. Mannarino*, and *Kenneth Whitted*, Assistant U.S. Attorneys.

*Daniel J. Lenerz*, Assistant U.S. Attorney, entered an appearance.

Before: GRIFFITH, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Calvin Stoddard, Sidney Woodruff, and Jerome Cobble were tried together for charges related to a heroin-distribution conspiracy and a conspiracy to launder money. A jury convicted Stoddard and Woodruff under 21 U.S.C. §§ 841(a)(1), 841(b)(1), and 846 for conspiracy to distribute and possess with intent to distribute heroin, and acquitted Jerome Cobble of the same charges. The jury returned a guilty verdict for Cobble on a separate charge of conspiracy to launder money in violation of 18 U.S.C. § 1956(h).

These prosecutions originated from an investigation the Government began in 2012 that focused on a notorious drug dealer, Jermaine Washington, who had recently been released from prison. After employing traditional surveillance techniques, the Government successfully applied for two wiretaps on Washington's cell phone. The evidence presented at Appellants' trial consisted, primarily, of conversations recorded from the wiretaps and the testimony of Washington interpreting the language in the conversations between Washington and the three defendants. After the Appellants were convicted, the District Court sentenced Stoddard and Woodruff to mandatory-minimum sentences triggered by the drug quantity that the jury had found to be attributable to the conspiracy as a whole. Appellants assert that the District Court committed multiple errors in ruling on pretrial motions, at trial, and at sentencing.

For the reasons discussed below, we (1) affirm the District Court's denial of Appellants' motions to suppress evidence obtained as a result of the wiretaps because the District Court did not abuse its discretion in finding that the Government had met the "necessity" requirement; (2) affirm the District Court's denial of Stoddard's and Woodruff's motions for acquittal; (3) affirm the District Court's denial of Woodruff's motion *in limine* to exclude evidence of a prior conviction if Woodruff had testified in his own defense; and (4) find no plain error in the District Court's jury instructions on the money-laundering charge. But we (5) reverse the District Court's denial of Cobble's motion for acquittal because the evidence was insufficient to sustain his money-laundering conviction. We also (6) vacate the sentences of Stoddard and Woodruff, remand for resentencing, and hold that, in order for a defendant to be sentenced based on a mandatory minimum triggered by a certain quantity of drugs, a jury must find the drug quantity attributable to the defendant on an individualized basis, not just the drug quantity attributable to the conspiracy as a whole. Finally, we reserve judgment on whether the District Court properly applied the career-offender enhancement before sentencing Woodruff, and instruct the District Court, on remand, to make that assessment based on new briefing from the parties and taking into account the intervening decision in *Beckles v. United States*, 137 S. Ct. 886 (2017).

## I.

In the spring of 2012, the D.C. Metropolitan Police Department partnered with the Federal Bureau of Investigation ("FBI") to investigate the heroin-trafficking activities of Jermaine Washington in the D.C. metro-area. Washington had been released from prison in 2010. The Government used an informant to make controlled drug-buys in Southeast D.C. and,

shortly thereafter, identified Washington as a potential source of heroin. Based on an extensive affidavit by FBI Special Agent Joshua Taylor, filed under seal, the District Court granted the Government's application for a wiretap on Washington's cell phone from July 16, 2012, through August 14, 2012. A second 30-day wiretap, also based on a sealed affidavit, was authorized on August 16, 2012. The Government also began surveilling Washington in the D.C. metro-area. The Government recorded several phone calls between Washington and Woodruff and between Washington and Stoddard. In the course of its physical surveillance, the Government observed Woodruff and Stoddard each meet with Washington one time.

Jerome Cobble is Washington's cousin. During the course of the Government's investigation, Cobble helped Washington purchase two vehicles. After initial reluctance, Cobble agreed to help Washington finance a Nissan Altima, and Cobble purchased the car in his own name. In the summer of 2012, Washington wrecked the Altima and discussed getting Cobble to help him buy a Lexus SUV, again in Cobble's name. On July 23, 2012, Cobble traded in the wrecked Altima and financed the purchase of the Lexus SUV from an auto dealer in Virginia for $30,000, making a $3,700 cash down payment from money Washington had won gambling in Atlantic City. As with the Altima, Cobble financed the car in his name, but the car would be Washington's to use and possess. Shortly after the purchase, the Lexus SUV was stolen.

The Government searched Washington's apartment on December 6, 2012, pursuant to a search warrant, and it recovered 20.1 grams of heroin, a digital scale, and $17,850 in cash. Washington agreed to cooperate, and on April 11, 2013, he pleaded guilty to drug-distribution conspiracy charges, and conspiracy to launder money and commit wire fraud.

A grand jury returned a superseding indictment charging Calvin Stoddard, Jerome Cobble, and Sidney Woodruff with conspiracy to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841, 846, and aiding and abetting under 18 U.S.C. § 2. The indictment also charged Cobble with conspiracy to launder money and conspiracy to commit wire fraud under 18 U.S.C. §§ 1956(h), 1349.

Before the trial proceedings began, Appellants filed motions to suppress evidence obtained through the wiretaps on Washington's cell phone, including the recorded conversations between Washington and each Appellant. Appellants argued that the Government's wiretap applications had not met the necessity requirement under 18 U.S.C. § 2518. The District Court denied the motions, ultimately concluding that the Government had met the necessity requirement and that it had shown in the wiretap application that other investigative techniques were reasonably unlikely to succeed.

At a status conference the day before trial, the Government informed the District Court that it was uncertain if it could proceed because Washington, its star witness, was acting strange and showing signs of reluctance to testify. After a delay to administer a competency evaluation to Washington, which he passed, the trial began.

At trial, the Government presented testimony of three law enforcement officers who had participated in the investigation, testimony from an expert in code words and methods used by drug dealers, and testimony of alleged co-conspirator Sandra Settles. Washington's testimony provided the strongest evidence against all three defendants. Washington interpreted the conversations from wiretapped phone calls, which were played for the jury.

Washington testified at trial about drug transactions with Stoddard and Woodruff, and about Cobble's role in helping him purchase a vehicle. The Government presented evidence consisting of audio recordings of conversations between Washington and Stoddard and between Washington and Woodruff, and Washington's testimony interpreting statements in those conversations. Some of this evidence included statements by Appellants that suggest they were negotiating prices and settling accounts from previous transactions with Washington. *See, e.g.*, A. 356-58 (Woodruff); A. 397-402 (Stoddard). For example, the Government played a conversation in which Woodruff stated: "I got somebody coming to town, man, that's trying to get 40, man, but he going to be here about 10:00 tonight . . . ." A. 363. Washington testified that he understood Woodruff to mean that Woodruff had a customer who "wanted to come and purchase 40 grams of heroin." A. 364. In another recorded conversation played at trial, Stoddard said to Washington, "[i]nstead of trying to grab for the extra two, I probably need just to leave that, you know, just keep it," which Washington testified was part of a discussion between the two men about the cut of heroin Stoddard was going to purchase from Washington and the tolerance of different heroin users. A. 390-91. Another conversation featured a discussion between Stoddard and Washington in which the men appeared again to discuss the discrepancies between, and preferences of, heroin-buyers. During that conversation, Washington stated that "[e]verybody's clientele is different." A. 394. Later in the conversation, Stoddard noted that he "learn[ed] a lot" from Washington. A. 395. Washington testified that, from 2011 to 2013, Woodruff purchased heroin from Washington "[o]ver ten times," A. 353, and that Stoddard purchased heroin from Washington between two and four times. A. 378.

Washington also offered testimony against his cousin, Jerome Cobble. Washington testified that Cobble helped him purchase a Lexus SUV from a car dealer in Virginia, and that Washington was dealing heroin during that time period and not otherwise employed. A. 413-16. Cobble "put the [title of the] vehicle in his name for [Washington] because at the time [Washington] didn't have a driver's license." A. 416. Washington recalled that both he and Cobble went to the car dealership together, and were in "the finance department" of the dealership together when they purchased the vehicle. A. 418. Washington made the down-payment on the Lexus with over $3,000 he had won placing a $10 bet at a casino in Atlantic City. A. 416-17. Washington took possession of the Lexus and kept it at his residence. A. 418-19. Washington and Cobble planned to make payments on the vehicle from Cobble's bank account, into which Washington would make monthly deposits to cover the payment. A. 418-20. The Lexus was stolen before any payments were made, but Washington testified that he may have used the Lexus to sell heroin during the short time he had the vehicle. A. 419. The Government also played a recorded conversation between Cobble and Washington in which they discussed buying some marijuana. A. 421-22. In that same conversation, Washington told Cobble about Washington's attempt to purchase a gun and some bullets. A. 422-24.

At various times during his direct and cross examinations, Washington behaved erratically and made statements suggesting his unreliability as a witness. For example, he stated that "[i]f somebody needed a false statement, and they was trying to pay some money for it, I sell it to them." A. 486. He repeatedly suggested he would "not remember" anything that was not written down or recorded. *See, e.g.*, A. 495. His emotional tumult was on display as well. At its apex, he had to be removed from the courtroom when questioned about his

relationship with his cousin, Cobble. A. 507-08. After this outburst, all three defendants moved for a mistrial, which the District Court denied.

The lawyers for each defendant rested their cases as soon as the Government had presented its case-in-chief. The defendants each moved for judgments of acquittal. The District Court denied Woodruff's and Stoddard's motions from the bench and reserved ruling on Cobble's motion. After further briefing, the District Court denied Cobble's motion for acquittal as well. In denying Cobble's motion for acquittal, the District Court noted that Cobble had argued only that there was insufficient evidence of "concealment money laundering" but that the Government had charged him with both concealment and promotional money laundering. A. 129. In holding that the evidence was sufficient to support a promotional money-laundering theory, the District Court relied on evidence that Washington had "on various occasions used a vehicle to deliver narcotics to buyers . . . along with evidence of Cobble's close relationship with Washington . . . ." A. 129-30.

The Government had initially proposed individual verdict forms that would have required the jury to determine the quantity of drugs attributable to each defendant. But the District Court, while recognizing that "there's a [circuit] split" on the issue, decided to use a verdict form without individualized drug-quantity determinations. A. 685. The jury found Woodruff and Stoddard guilty of the drug-conspiracy charge and found that the conspiracy, as a whole, involved 100 grams or more of heroin. The jury found Cobble not guilty of the drug conspiracy charge but guilty of the money laundering charge.

Woodruff and Stoddard each moved for a new trial because, they contended, the jury should have found the

amount of drugs attributable to each of them individually rather than the amount attributable to the conspiracy as a whole. The Government opposed the motion but agreed with the defendants that the jury should have been given a verdict form that instructed the jury to find an amount attributable to each defendant, and therefore that the District Court should sentence the defendants based on an indeterminate quantity of heroin, not the 100 grams the jury had found were attributable to the conspiracy as a whole. The District Court denied these motions and ruled that there was no need for individual findings of the drug quantity for each defendant. The District Court explained its reasoning:

> The fact that subjects the defendants to the enhanced statutory maximum of 40 years is that the conspiracy involved 100 grams or more of heroin. That fact was submitted to the jury and found by the jury beyond a reasonable doubt. . . . *Apprendi* and *Alleyne* did not address whether a jury must find that the amount of drugs that triggers a statutory mandatory minimum penalty in a narcotics conspiracy is attributable to the conduct of a convicted conspirator – or is reasonably foreseeable by him or her as the amount involved in the conspiracy – before that amount's penalties are triggered for that conspirator. The circuits have split on how . . . to properly resolve this question. . . . The D.C. Circuit has not resolved this question either. . . . The instructions provided to the jury here and the corresponding verdict form are consistent with the view that the jury need determine only the amount of drugs attributable to the entire conspiracy, but not to the individual defendants.

A. 109-14 (footnotes omitted).

Woodruff and Stoddard raised the issue again at sentencing, arguing that the District Court should decline to impose a five-year mandatory minimum or a forty-year statutory maximum, both of which are applicable when a defendant conspires to distribute 100 grams or more of heroin under 21 U.S.C. § 841(b)(1)(B). The Government agreed with this assessment in its initial sentencing memorandum. The District Court overruled the objections.

Woodruff also objected to other aspects of his PSR, including his career-offender designation resulting from a 1984 armed-robbery conviction and a 1991 drug-distribution conviction in Maryland. The PSR recommended applying a career-offender enhancement under USSG § 4B1.1 with an offense level of 34 and a criminal history category of VI, which would have resulted in a guidelines range of 262 to 327 months. Woodruff objected, but the District Court did not rule on the objection, finding instead that it would not matter because "[b]oth parties seek a sentence below the guidelines that would apply . . . ." A. 732-33, 736.

The District Court determined that a guidelines range of 262 to 327 months applied to Woodruff and departed downward for a sentence of 80 months, followed by 48 months of supervised release. The District Court noted, "[f]or the record, [it] would have imposed this same sentence if no five-year mandatory minimum had applied here." A. 741. The District Court gave Stoddard a 60-month sentence, which it believed to be the appropriate mandatory minimum, along with 48 months of supervised release. Cobble was sentenced to 24 months of probation.

**II.**

All Appellants challenge the District Court's denial of their motions to suppress the evidence gathered as a result of the wiretaps, and the District Court's denial of each Appellant's motion for acquittal. In addition, Cobble challenges the District Court's jury instructions on money laundering; Stoddard and Woodruff challenge their sentences because the jury never found that each of them was individually responsible for over 100 grams of heroin; Woodruff challenges the District Court's ruling on a motion *in limine* that, if he were to testify in his own defense, the Government would be able to introduce his 1984 armed-robbery conviction to impeach him; and Woodruff also challenges the District Court's use of the 1984 armed-robbery conviction as a basis to apply the career-offender sentencing enhancement.

**A.**

First, Appellants contend that the District Court erred in denying their motions to suppress evidence obtained as a result of the wiretaps. In evaluating this challenge, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Eiland*, 738 F.3d 338, 347 (D.C. Cir. 2013). "A reviewing court gives deference to the authorizing court's determinations of probable cause and necessity," but "[w]e 'do not typically give a second layer of deference to a district court's assessment' of the authorizing court's determinations." *Id.* (quoting *United States v. Glover*, 681 F.3d 411, 420 (D.C. Cir. 2012) (alteration omitted)). We review the initial necessity determination for abuse of discretion. *Glover*, 681 F.3d at 419-20.

The District Court did not err in denying Appellants' motions to suppress.

Under 18 U.S.C. § 2518(1)(c), an application for a wiretap must include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This "necessity requirement" is "a keystone of congressional regulation of electronic eavesdropping." *United States v. Williams*, 580 F.2d 578, 587-88 (D.C. Cir. 1978). "Congress created the necessity requirement to ensure that 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). "[A] court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope." *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (quotation marks omitted). Rather than simply making generalized assertions about the difficulty of drug conspiracies generally, "[t]he affidavit [in support of the application] must show with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983).

Appellants argue that the order authorizing the wiretap "contains no actual analysis of necessity." Appellants' Br. 32. Because the District Court "merely parroted the statutory language," Appellants claim there was never "any specific showing that a wiretap was necessary." Appellants' Br. 32-33. They also claim that the affidavit by Special Agent Taylor was defective because he "used vague and boilerplate language about drug conspiracy investigations *in general*" to justify the wiretap. *Id.* at 33 (emphasis in original).

None of Appellants' arguments has merit. In fact, the authorizing court based its wiretap authorization on a finding of probable cause that Washington would be communicating via his cell phone concerning "the nature, scope, extent and methods of operation of the narcotics trafficking activities in which the targeted subjects and others as yet unknown . . . are engaged." A. 51. Relying on Special Agent Taylor's sealed affidavit, the District Court found that it had been "established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." A. 52. Appellants ignore the significant portion of Special Agent Taylor's wiretap application devoted to the specific information collected and investigative techniques employed up until the point of the wiretap application. In addition to attesting to his general knowledge about drug-dealing conspiracies, Special Agent Taylor also noted that the investigative techniques used had resulted in significant intelligence establishing that Washington was using his phone to conduct drug deals. Special Agent Taylor submitted a detailed analysis describing the extent of the investigation and the techniques used, offering a reasonable explanation as to why each one was becoming less useful and a wiretap was needed.

Necessity does not require the Government to show that "every other imaginable method of investigation has been unsuccessfully attempted[;] [r]ather, it is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require" the Government to pursue all of those avenues. *Williams*, 580 F.2d at 588 (quotation marks omitted). The Government made that showing here, providing a detailed analysis of the gaps left by traditional investigative techniques and the necessity of a wiretap in "this particular investigation." *See Robinson*, 698

F.2d at 453.[1]    We affirm the District Court's denial of Appellants' motions to suppress evidence obtained as a result of the wiretaps.

**B.**

This Court reviews *de novo* the denial of a motion for acquittal, viewing the evidence in the light most favorable to the Government.  *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001).  Cobble argues that there was insufficient evidence to sustain his money-laundering conspiracy conviction, and that the District Court erred in denying his motion for acquittal.[2]  Title 18 section 1956 is violated when a person,

---

[1] Appellants argue that the recordings from the second wiretap should have been suppressed as illegal fruit of the first wiretap, and alternatively, that the information gained from the first wiretap made the wiretap extension unnecessary.  Appellants' Br. 37-39.  Both of these arguments fail.  The first wiretap was not unlawful, and the Government's request for an extension was justified on the basis that the Government was still attempting to determine all participants in the conspiracy and the supplier of the drugs involved, which suffices to satisfy the necessity requirement for the second wiretap.

[2] In Appellants' opening brief, Cobble also challenged the District Court's money-laundering instructions based on the District Court's omission of an instruction about the proper definition of "profits." Appellants' Br. 46-50.  Cobble's arguments were based on the Supreme Court's decision in *Santos v. United States*, 553 U.S. 507 (2008).  Appellants overlook, however, that Congress amended the Act in 2009 to respond to *Santos* and make clear that "proceeds" includes "gross receipts" under the Statute.  *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1617, 1618 (2009).  Presumably in recognition of Congressional negation of *Santos*'s statutory holding, Appellants abandoned this argument in their Reply Brief.  The District Court did not err; it

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity (A) with the intent to promote the carrying on of specified unlawful activity . . . or (B) knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i). Cobble was charged with violating both prongs of § 1956(a)(1) – promotional money laundering under subsection (A) and concealment money laundering under subsection (B). The Government's trial strategy focused on the concealment theory, but the District Court ultimately concluded that the evidence was sufficient to sustain Cobble's conviction under the promotional theory.[3]

The money-laundering statute "prohibits specified transfers of money derived from unlawful activities." *Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008). The concealment prong of § 1956(a)(1) covers "the conversion

---

instructed the jury in a manner that accurately reflected the law as Congress amended it in 2009.

[3] Although Appellants' briefing focuses on concealment money laundering, Cobble's challenge to the District Court's holding that the evidence was sufficient under the promotional money-laundering theory is properly before this Court. The Government never argued forfeiture to challenge the sufficiency of the evidence below, nor did they argue that this argument had been forfeited on appeal.

of cash into goods and services as a way of concealing or disguising the illegal wellspring of the cash." *United States v. Law*, 528 F.3d 888, 895 (D.C. Cir. 2008) (quotation marks omitted); *see also United States v. Adefehinti*, 510 F.3d 319, 322-23 (D.C. Cir. 2007) (reversing money laundering convictions where the Government had shown only evidence that the defendants used ill-gotten gains in the financial transaction, with no evidence that the defendants had attempted to "hide the provenance of the funds involved") (quotation marks and citations omitted). Thus, a person violates the concealment prong when he or she engages in a transaction "knowing that the transaction" was "designed in whole or in part to conceal or disguise" the proceeds. 18 U.S.C. § 1956(a)(1)(B).

In *Law*, we overturned a concealment money-laundering conviction of a defendant who had taken over the mortgage of a small apartment building from a drug dealer, while the defendant also maintained an apartment in the building out of which he dealt drugs. 528 F.3d at 896-98. The defendant argued that the mortgage payments were not designed to conceal the source of any funds, but simply to earn money by managing the property, collecting rents, and paying the mortgage. We reversed the conviction, stating that "when faced with an innocent explanation sufficiently supported by the evidence to create a reasonable doubt about the defendant's guilt, the Government's burden is to present evidence sufficient to dispel that doubt." *Id.* at 896; *see also United States v. Hall*, 434 F.3d 42, 50 (1st Cir. 2006); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994) ("[T]ransactions [that] are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, . . . do not violate the money laundering statute."). The Government's evidence to rebut the innocent explanation – primarily pointing to the fact that the defendant paid the mortgage in the owner's name

– was insufficient to demonstrate that the defendant's payments were designed to conceal the source of the funds. *Law*, 528 F.3d at 896.

The promotion prong of § 1956(a)(1) "is aimed . . . only at transactions which funnel ill-gotten gains directly back into the criminal venture." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). Thus, to violate the promotion prong, a defendant must have intended to promote the illegal activity by engaging in the financial transaction or conspiring to do so. In general, intent to promote the underlying illegal activity can be demonstrated by facts that show the defendant benefited from, or had extensive knowledge about, the underlying illegal activity he was promoting. *See, e.g.*, *United States v. Trejo*, 610 F.3d 308, 314-16 (5th Cir. 2010) (discussing the "nature of proof" in promotional money laundering cases and noting that "courts have often relied on proof that the defendant was aware of the inner workings of and/or extensively involved in the drug organization . . . ."); *id.* at 315 n.8 (collecting cases); *see also Adefehinti*, 510 F.3d at 322-23 (collecting cases and discussing what kind of evidence shows indicia of intent to commit money-laundering violations).

Based on the trial record, we conclude that the evidence was insufficient to support Cobble's conviction for money laundering. We assume without deciding that a reasonable factfinder could infer that Cobble knew the money Washington planned to pay on the Lexus note was likely to come from drug-trafficking proceeds because the two men were close, and there was sufficient evidence to show that Cobble knew that Washington was a drug dealer. Thus, we analyze whether the evidence was sufficient to demonstrate that Cobble entered a conspiracy either knowing that the transaction was designed to "conceal or disguise" the origin of the drug-trafficking

proceeds or with the specific intent to "promote" Washington's drug-trafficking.

Cobble's conviction cannot be sustained under a concealment theory. The evidence was insufficient for a rational trier of fact to find that Cobble violated § 1956(a)(1)(B)(i), because no evidence showed that the transaction was designed to conceal the source of the funds, and Cobble's innocent explanation for engaging in the transaction – helping his cousin purchase a car for personal use – was never challenged by the Government through the presentation of evidence. *See Law*, 528 F.3d at 896. Apparently, the District Court agreed with this assessment because, after struggling to find any evidence that Cobble "joined in an agreement with any intent to promote drug dealing" or conceal the source of funds, A. 715, it ruled that evidence was sufficient to sustain the verdict under a promotional money-laundering theory. A. 129.

The Government unpersuasively attempts to distinguish *Law* by arguing that sufficient evidence was presented at trial to sustain Cobble's conviction, Appellee's Br. 55-56, but the Government fails to point to any evidence that the transaction was designed to conceal the source of the funds (much less that Cobble had knowledge of any such design). This is because there was no such evidence. Cobble and Washington openly went to the dealership and purchased the car together, both sitting in the finance department as they made arrangements for Cobble to purchase the Lexus in his name and for Washington to take possession of the vehicle. And after the purchase, Washington took possession of the Lexus, keeping it at his house until it was stolen shortly thereafter. Nothing about the transaction to purchase the Lexus SUV shows *any* indicia of a design to conceal the "nature, the location, the source, the

ownership, or the control" of the proceeds used to purchase the Lexus.

The evidence presented at trial was also insufficient to sustain Cobble's conviction under the Statute's promotion prong. The Government had to prove beyond a reasonable doubt that Cobble intended to promote Washington's drug dealing in order to sustain a conviction under § 1956(a)(1)(A)(i). *See Trejo*, 610 F.3d at 314 ("It is not enough to show that a money launderer's actions *resulted* in promoting the carrying on of specified unlawful activity. Nor may the Government rest on proof that the defendant engaged in 'knowing promotion' of the unlawful activity. Instead, there must be evidence of *intentional* promotion.") (internal citations omitted, emphasis in original). Cobble was acquitted of charges that he was involved in the conspiracy to distribute heroin. And, as Appellants point out, "the Government introduced no evidence that Cobble ever aided Washington, held drugs or money for him, accompanied Washington to any drug transactions, or was aware of exactly how his cousin distributed drugs, including whether Washington used a car in any drug activities." Appellants' Reply Br. 17-18.

The Government's lack of evidence is particularly important because Cobble offered an innocent explanation for the purchase of the Lexus: He helped his cousin buy the SUV because his cousin needed a car but had bad credit and no driver's license. A. 530-31. As the Court explained in *Law*:

> [W]hen faced with an innocent explanation sufficiently supported by the evidence to create a reasonable doubt about the defendant's guilt, the Government's burden is to present evidence sufficient to dispel that doubt. The need for evidence that excludes such an innocent

> explanation is especially important in relation to a charge of money laundering because of the fine line between laundering and merely spending illicit funds.

528 F.3d at 896. This principle from *Law* applies with just as much force in the context of promotional money laundering, and the Government's presentation of evidence to prove Cobble's intent to promote the illegal activity was insufficient.

Washington testified that Cobble had nothing to do with his heroin-dealing operation, and the jury apparently believed him. The Government proffered no evidence at trial to overcome *its own witness's testimony* that there was an innocent explanation for Cobble's assistance in purchasing the Lexus SUV.

At oral argument, counsel for the Government contended that there was a "mountain of evidence" showing that Cobble's knowledge about the drug-conspiracy was so extensive that it could demonstrate to the jury Cobble's intent. Oral Arg. Recording at 31:19-31:30; *see also id.* at 30:00-32:00. But that "mountain" was a molehill. The only evidence the Government could point to merely showed that Cobble and Washington were close, that they talked on the phone at one point about Washington purchasing a gun and bullets and buying a relatively small amount of marijuana together, A. 421-23, 428-29, and that Washington told Cobble that he was doing well enough financially to afford the auto payments. None of that evidence suffices to demonstrate that Cobble even *knew* about the heroin-trafficking operation, much less that he *intended* to promote Washington's heroin dealing.

This evidentiary showing does not meet the Statute's requirement that the Government put on evidence sufficient to

prove beyond a reasonable doubt that Cobble conducted "a financial transaction . . . with the intent to promote the carrying on of specified unlawful activity." Whatever Cobble might have known about Washington, Cobble offered the innocent explanation that he purchased the car in his name to help out his cousin who had bad credit and no driver's license. The Government never offered evidence to rebut Cobble's explanation, and not nearly enough evidence was introduced to support the Government's theory that Cobble intended to promote Washington's illegal activities. We therefore reverse Cobble's conviction.

## C.

In order to convict Woodruff and Stoddard of a drug conspiracy, the Government had to prove beyond a reasonable doubt that the two men had "knowingly entered into a conspiracy with the specific intent to further the objective of distributing narcotics." *United States v. Gaskins*, 690 F.3d 569, 582 (D.C. Cir. 2012). Appellants argue that the evidence below was insufficient to sustain their convictions for entering a conspiracy to traffic heroin. Reviewing the evidence *de novo* and in the light most favorable to the Government, the jury's guilty verdict rested upon sufficient evidence to sustain the convictions.

Appellants' core argument is that Washington's testimony – which, along with the recorded conversations picked up from the wiretap on Washington's cell phone, was the primary evidence against them – was unreliable and that, without it, no reasonable jury could find Appellants guilty. Appellants point out that the Government presented no direct evidence linking Stoddard or Woodruff to distribution of heroin. In addition to Washington's testimony and the recorded conversations, the evidence included testimony from the Government's

cooperating witness – Sandra Settles – and two FBI agents who had listened to the wiretaps and been involved in the investigation. Settles testified that she did not interact with the Woodruff or Stoddard, and the two FBI agents had never seen them with heroin. *See* A. 297; 200-52; 303-12; 533-64. Appellants also point out that, even after Woodruff and Stoddard's arrests, no heroin or drug paraphernalia was found at their residences. Appellants' Br. 51. Thus, according to Appellants, the primary evidence against them is Washington's unreliable testimony. *Id.* at 52-53 (citing *Jackson v. United States*, 353 F.2d 862, 867 (D.C. Cir 1965) ("In some cases [] testimony . . . will simply be too weak and to[o] incredible, under the circumstances, to accept.")).

Appellants are correct that Washington showed signs that he lacked credibility as a witness. Appellants point to numerous exchanges that call into question Washington's credibility. *See, e.g.*, A. 483; 486; 492; 495; 496. Appellants are also correct that the only evidence supporting Woodruff's and Stoddard's convictions for entering the conspiracy to distribute heroin are the recordings of the wire intercepts and Washington's testimony interpreting those conversations. No physical evidence was recovered linking Woodruff and Stoddard to heroin, no law enforcement agents ever saw Woodruff or Stoddard with heroin, and Settles never saw Woodruff or Stoddard with Washington. *See* A. 297-98.

However, despite Washington's unreliability on the stand, the recorded conversations between Washington and Woodruff and Washington and Stoddard are not as ambiguous as Appellants suggest. Between those recordings and the testimony of Washington, however flawed he may have been as a witness, there was sufficient evidence, viewed in a light favorable to the Government, for a reasonable juror to convict

Woodruff and Stoddard of entering a conspiracy to distribute heroin.

The Government presented credible testimony about intercepted wire communications between Washington and Woodruff, A. 356-76, and between Washington and Stoddard, A. 384-407, that consists of the two Appellants negotiating prices with Washington and discussing matters that strongly suggest they were distributing the heroin they purchased from Washington. *See, e.g.*, A. 363 (statement on wire intercept apparently by Woodruff, stating "I got somebody coming to town, man, that's trying to get 40, man, but he going be here about 10:00 tonight . . . ."); A. 390 (statement on wire intercept by Stoddard, stating "Instead of trying to grab for the extra two, I probably need just to leave that, you know, just keep it," apparently discussing the cut of the heroin he was to purchase from Washington); A. 395 (statement on wire intercept apparently by Stoddard, stating to Washington: "Whether you know it or not . . . I learn a lot [] from you[.]"); A. 397-402 (recordings of wire intercept played that appeared to be conversations between Washington and Stoddard negotiating prices for heroin and discussing how much heroin Stoddard would need for a few weeks).

As the Government correctly points out, this "Court does not revisit the jury's determination to credit a witness." Appellee's Br. 60 (citing *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991)). And there was sufficient evidence presented to the jury in the form of recorded conversations, and Washington's testimony interpreting those conversations, to sustain Woodruff's and Stoddard's convictions. We affirm the District Court's denial of their motions for acquittal.

**D.**

We review the District Court's decision to admit or exclude evidence for abuse of discretion. *United States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008). Appellants argue that the District Court abused its discretion by ruling under Federal Rule of Evidence 609 that, if Woodruff testified in his own defense, the Government would be allowed to impeach him based on his D.C. conviction for armed robbery in 1984. Appellants' Br. 55-66.

Woodruff chose not to testify, however, so his argument runs squarely into *Luce v. United States*, 469 U.S. 38 (1984), which held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 43. We applied the reasoning of *Luce* in *United States v. Coumaris*, 399 F.3d 343 (D.C. Cir. 2005), in an analogous circumstance, and we apply it again here. Although the Government failed to rely on *Luce* in its brief and thus forfeited the argument, we exercise our discretion to reach the issue because it is "logically 'antecedent to and ultimately dispositive of [a] dispute before [us]" – whether any error in the District Court's ruling on the *motion in limine* was harmless. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 740 (D.C. Cir. 1995) (quoting *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 447 (1993)).

**E.**

Woodruff and Stoddard challenge their sentences on the basis that the District Court improperly sentenced each of them to the mandatory minimum for entering a conspiracy to distribute 100 grams or more of heroin, even though the jury did not make individualized findings as to the amount of heroin attributable to each of them. The jury below was required to

determine only whether the defendants had conspired to distribute some amount of a substance containing heroin, and whether the amount of heroin ultimately distributed in connection with the conspiracy exceeded 100 grams.

The District Court instructed the jury that "the government must show the defendant's membership in the narcotics conspiracy," but "[t]he defendant need not know . . . all of the details of the narcotics conspiracy, nor the means by which its purposes were to be accomplished." Trial Tr., 35, No. 13-CR-200, June 5, 2015 (AM). "It is necessary [] that the government prove beyond a reasonable doubt that the defendant was aware of the common purpose, had knowledge that the narcotics conspiracy existed, and was a willing participant with the intent to advance the purpose of the narcotics conspiracy." *Id.* Further, "[t]he specific amount of any controlled substance involved is not an element of the offense of conspiracy." *Id.* at 36. If the jury found that each defendant had entered a conspiracy to distribute a controlled substance containing heroin, they were instructed to "ask [them]selves whether the government proved that the amount of the mixture or substance containing heroin that was the subject of the conspiracy was 100 grams or more." *Id.*; *see also* A. 92-93 (jury verdict form). Thus, the jury was not required to find that each defendant was individually responsible for entering a conspiracy to distribute 100 grams or more of heroin (*i.e.*, that it was "reasonably foreseeable" to each defendant that 100 grams or more would be distributed within the scope of the conspiracy).

The circuits are split on whether an individualized jury finding as to the quantity of drugs attributable to (*i.e.*, foreseeable by) an individual defendant is required to trigger a mandatory minimum, or if it is sufficient for the jury to find that the conspiracy as a whole resulted in distribution of the mandatory-minimum-triggering quantity. The difference is

subtle but important.  In *Law*, we suggested a preference for the former approach.  Here, that would require the jury to find that each defendant entered the conspiracy to distribute not just an indeterminate amount of heroin that turned out to be over 100 grams, but that the 100-gram quantity was reasonably foreseeable, or within the scope of the conspiracy entered by a particular defendant.  Now, based on the cases and principles discussed below, we adopt the individualized approach, vacate Stoddard's and Woodruff's sentences, and remand for resentencing.

Whether the mandatory-minimum sentence for a defendant who traffics in 100 grams or more of heroin applies without an individualized finding as to the quantity for which the defendant is responsible is a question of law that we review *de novo*.  *See* 21 U.S.C. § 841(b)(1)(B); *see also United States v. Cook*, 594 F.3d 883, 886 (D.C. Cir. 2010).

The Supreme Court has held that a jury must find any facts "that increase the prescribed range of penalties to which a criminal defendant is exposed," *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and that "[f]acts that increase the mandatory minimum sentence are [] elements and must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 108 (2013).  A district court thus errs when it applies a mandatory minimum based on a fact that was not found by the jury.  Recently, the Supreme Court applied these principles to drug-conspiracy convictions under § 841(b)(1), requiring – before imposing the statutory mandatory minimum triggered when death results from the distributed drug – that a jury find the fact of resultant death that triggers the mandatory minimum.  *Burrage v. United States*, 134 S. Ct. 881 (2014).  "Because the 'death results' enhancement increase[s] the minimum and maximum sentences . . . , it is an element that must be submitted to the

jury and found beyond a reasonable doubt." *Id.* at 887; *see also id.* at 887 n.3 (noting that a drug-conspiracy charge under § 841(a)(1) is "thus a lesser-included offense of the [charged] crime" of drug-conspiracy and resultant death). These principles apply just the same to the fact of a mandatory-minimum drug quantity.

The question remains "whether it is the *individualized* drug quantity that is a fact that increases the mandatory minimum sentence." *United States v. Pizarro*, 772 F.3d 284, 292 (1st Cir. 2014) (quotation marks omitted). Or whether, as the District Court found, the amount of drugs attributable to the conspiracy as a whole can be the fact which triggers the mandatory minimum for an individual defendant.

The circuits are split on this issue. The First, Fourth, Fifth, and Ninth Circuits have adopted the individualized approach. *See United States v. Haines*, 803 F.3d 713, 738-42 (5th Cir. 2015); *United States v. Rangel*, 781 F.3d 736, 742-43 (4th Cir. 2015) (citing *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005)); *Pizarro*, 772 F.3d at 292-94; *United States v. Banuelos*, 322 F.3d 700, 704-06 (9th Cir. 2003). The Third and Seventh Circuits have explicitly adopted the conspiracy-wide approach. *See, e.g.*, *United States v. Phillips*, 349 F.3d 138, 141-43 (3d Cir. 2003), *vacated on other grounds*, *Barbour v. United States*, 543 U.S. 1102 (2005); *United States v. Knight*, 342 F.3d 697, 709-12 (7th Cir. 2003).

Although some circuits have used the conspiracy-wide approach, it has been called into question by *Alleyne* and subsequent cases from those circuits. Notably, the circuits to adopt the conspiracy-wide approach did so before *Alleyne* was decided in 2013, while all circuits to explicitly address the issue in *Alleyne*'s wake have adopted or followed the individualized approach. The circuits that earlier adopted the conspiracy-wide

approach have, at times, failed to grapple with it in subsequent published and unpublished cases decided after *Alleyne*.

Two circuits that initially adopted the conspiracy-wide approach have recently questioned whether that approach is the correct one in a post-*Alleyne* world. For example, the Sixth Circuit appeared to adopt the conspiracy-wide approach in *United States v. Robinson*, 547 F.3d 632 (6th Cir. 2008), but later panels questioned whether it was consistent with earlier Sixth Circuit case law. *See United States v. Young*, 847 F.3d 328, 366-67 (6th Cir. 2017) (finding that the defendant's sentence could be upheld under either approach, and noting that "there is no need for us to reconcile these [conflicting] cases at this time"); *see also United States v. Gibson*, No. 15-6122, 2016 WL 6839156 (6th Cir. Nov. 21, 2016), *vacated*, 854 F.3d 367 (6th Cir. 2017) (en banc). In *Gibson*, the panel reluctantly applied *Robinson*, and the full court took the case *en banc*, ultimately dividing equally, resulting in a reinstatement of the district court's sentence based on the conspiracy-wide approach. *United States v. Gibson*, 874 F.3d 544 (6th Cir. 2017) (en banc).

Similarly, the Tenth Circuit held in *United States v. Stiger*, 413 F.3d 1185 (10th Cir. 2005), that "[t]he jury is not required to make individualized findings as to each coconspirator because the sentencing judge's findings do not, because they cannot, have the effect of increasing an individual defendant's exposure beyond the statutory maximum justified by the jury's guilty verdict." *Id.* at 1193 (quotation marks omitted); *see also id.* at 1192 (recognizing that "the judge lawfully may determine the drug quantity attributable to [each] defendant and sentence him accordingly (so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination)") (internal citation and quotation marks omitted)). But recently, the Tenth Circuit

called *Stiger* into question in *United States v. Ellis*, 868 F.3d 1155, 1170 & n.13 (10th Cir. 2017) ("[A] defendant can be held accountable for that drug quantity which was within the scope of the agreement and reasonably foreseeable to him") (quoting *United States v. Dewberry*, 790 F.3d 1022, 1030 (10th Cir. 2015) (quotation marks omitted)). The reason is simple: *Alleyne* undercut the rationale put forth in *Stiger* for adopting the conspiracy-wide approach because, after *Alleyne*, it was no longer the case that a judge could "lawfully" determine a fact that would increase a defendant's mandatory-minimum sentence.

Even in the Third and Seventh Circuits, recent cases call into question whether the earlier cases adopting the conspiracy-wide approach are still being followed. *See, e.g.*, *United States v. Cruse*, 805 F.3d 795, 817-18 (7th Cir. 2015) (holding that the failure to give the jury a *Pinkerton* instruction as to drug quantity did not affect the defendant's substantial rights, but noting that, if it had, "the remedy for the error would be resentencing under the default drug-conspiracy penalty provision"); *United States v. Miller*, 645 Fed. App'x 211, 218 (3d Cir. April 1, 2016) (finding error because "the jury did not determine [a drug quantity] directly attributable" to the individual defendant, but holding that the error was harmless).

We adopt the individualized approach to drug-quantity determinations that trigger an individual defendant's mandatory minimum sentence. It is a core principle of conspiratorial liability that a co-conspirator may be held liable for acts committed by co-conspirators during the course of the conspiracy only when those acts are "in furtherance of the conspiracy" and "reasonably foresee[able]" to the defendant. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946); *see also United States v. McGill*, 815 F.3d 846, 917 (D.C. Cir. 2016). "Reasonable foreseeability" shapes the outer bounds of

co-conspirator liability, and it applies to drug quantities that trigger enhanced penalties just the same as it applies to other acts committed by co-conspirators. *Cf. Burrage*, 134 S. Ct. at 887.

This result follows naturally from the rationale behind our decision in *Law*, which was only strengthened by the Supreme Court's subsequent decisions in *Alleyne* and *Burrage*. In *Law*, the defendant had been sentenced based on a jury finding of the quantity of drugs involved in the conspiracy as a whole. Law argued that he could be sentenced only based on the quantity of drugs involved in the largest of any single transaction that occurred within the conspiracy, rather than the aggregate drug quantity of all of the transactions that occurred during the conspiracy. *Law*, 528 F.3d at 906. Under plain error review, we rejected Law's argument because, "a single agreement to commit several crimes constitutes one conspiracy." *Id.* (quotation marks omitted). Thus, "a single violation of the conspiracy statute encompasses all of the crimes reasonably foreseeable within that conspiracy." *Id.* So we held that "a defendant convicted of conspiracy to deal drugs, in violation of § 846, must be sentenced, under § 841(b), for the quantity of drugs *the jury attributes to him as a reasonably foreseeable part of the conspiracy*." *Id.* (emphasis added).[4] Although we did not directly confront the issue before us now in *Law*, *see United States v. Garcia*, 757 F.3d 315, 321 (D.C. Cir. 2014),

---

[4] We sustained Law's conviction against a sufficiency challenge as well, because of the "overwhelming evidence" of the drug quantities involved in the conspiracy, including physical evidence recovered from Law's apartment and testimonial evidence that Law himself participated in transactions that, in aggregate, got him to the 50-gram quantity that triggered his life sentence. *Id.* at 906-07 (pointing to testimony that Law had participated in over 45 different transactions involving the particular drug, half of which involved individual purchases of over 50 grams).

we apply the principle of *Law* to adopt the individualized approach to sentencing on the basis of drug quantity.

The Supreme Court in *Burrage* offered a new way to think about drug-conspiracy offenses involving an aggravating element that enhances a defendant's sentence. Conspiring to violate § 841(a)(1) is properly thought of as "a lesser-included offense" of conspiring to violate § 841(a)(1) when death results from the drug distribution. *Burrage*, 134 S. Ct. at 887 n.3. *Alleyne* sets up this paradigm because the "death results" element is a fact that triggers a mandatory minimum sentence and thus must be found by a jury. *See* 570 U.S. at 108. Similarly, conspiring to violate § 841(a)(1) is a "lesser-included offense" of conspiring to violate § 841(a)(1) when the drug quantity meets a threshold that triggers an enhanced sentence.

The principle we set forth in *Law* that "a defendant convicted of conspiracy to deal drugs . . . must be sentenced, under § 841(b), for the quantity of drugs the jury attributes to him as a reasonably foreseeable part of the conspiracy," along with the *Alleyne*/*Burrage* paradigm supports our conclusion that the individualized approach to determining a mandatory-minimum-triggering drug quantity is correct. 528 F.3d at 906. We are also persuaded by the decisions of our sister circuits that have adopted the individualized approach. Those opinions buttress our conclusion here. *See, e.g.*, *Collins*, 415 F.3d at 311-14 (relying in part on *Pinkerton* principles in holding that the individualized approach to drug quantity is the correct one).

The Government's general charging and motions practices offer further evidence that the criminal justice system is moving toward the individualized approach. The Government's argument for the conspiracy-wide approach here appears to be a one-case wonder. At oral argument, the

Government could not safely say that there are any other cases in this Circuit in which it is currently arguing for a court to adopt the conspiracy-wide approach. Oral Arg. Recording at 47:45-48:56. Even in circuits that have adopted the conspiracy-wide approach, the Government has at times urged those courts to reconsider, and represented that its charging policy employs the individualized approach. *See Young*, 847 F.3d at 366 & n.3 (6th Cir. 2017) ("The government also mentions it has adopted a defendant-specific approach to charging future drug conspiracies.").

The District Court's error was not harmless here because the evidence was far from overwhelming with respect to the quantity of heroin involved in the conspiracy that was reasonably foreseeable to Woodruff and Stoddard. Had the jury been properly instructed and given a proper verdict form, the outcome may well have been different. Based on the foregoing, we vacate Stoddard's and Woodruff's sentences and remand to the District Court with instructions to re-sentence each Appellant based on the crime for which the jury found each one of them individually liable: entering into a conspiracy to distribute an indeterminate quantity of heroin.

## F.

Because we vacate Woodruff's sentence and remand this case for resentencing consistent with our holding in § II.E, *supra*, we decline to reach Woodruff's challenge to the District Court's use of the career-offender enhancement to calculate his Sentencing Guidelines range.[5] On remand, we instruct the

---

[5] In the District Court, the Government argued that Woodruff's 1984 armed robbery conviction counted as a "crime of violence" under the "elements clause" of USSG § 4B1.1. The Government represents that it assumed the Supreme Court's opinion in *Johnson v. United States*, 135 S. Ct. 2551 (2015), holding that the residual clause of the

District Court to assess anew whether it is appropriate to use the career-offender enhancement to calculate Woodruff's Guidelines Range in light of comprehensive arguments and briefing by both parties, including arguments now open to the Government in light of the Supreme Court's intervening decision in *Beckles*, 137 S. Ct. 886. If necessary, we will reach the question of whether Woodruff's 1984 armed robbery conviction can serve as a valid predicate offense to use the career-offender enhancement after Woodruff's new sentence is imposed and appealed.

## III.

For the reasons discussed above, we affirm the District Court's denial of Appellants' motions to suppress; affirm the District Court's denial of Woodruff's and Stoddard's motions for acquittal; reverse the District Court's denial of Cobble's motion for acquittal; and vacate Woodruff's and Stoddard's sentences and remand their cases to the District Court for re-sentencing consistent with this Opinion.

---

Armed Career Criminal Act was unconstitutional, meant that the residual clause of USSG § 4B1.1 was likewise unconstitutional. Appellee's Br. 87 n.48. But the Supreme Court held in *Beckles* that the residual clause in the Sentencing Guidelines was not unconstitutional. Thus, on appeal the Government makes arguments based on the residual clause. Although we review the District Court's calculation of sentencing guidelines *de novo*, we believe that it is prudent to postpone making this assessment, if necessary at all, until after the parties marshal their arguments during the resentencing proceedings based on the clarification offered in *Beckles*.